UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MANNY SILVERMAN GALLERY, INC., and RICHARD L. FEIGEN & CO., INC., individually and as assignees of STEPHEN ROBERT,

Plaintiffs,

-against-

KNOEDLER GALLERY, LLC, d/b/a KNOEDLER & COMPANY, ANN FREEDMAN, GLAFIRA ROSALES, JOSÉ CARLOS BERGANTIÑOS DIAZ, MICHAEL HAMMER, 8-31 HOLDINGS, INC., and JAIME ANDRADE,

Defendants.

No. 13 Civ. 8495 (PGG) (HBP)

## MEMORANDUM OF LAW IN SUPPORT OF ANN FREEDMAN'S MOTION TO DISMISS

Dated: August 15, 2014

**BOIES, SCHILLER & FLEXNER LLP**

Luke Nikas
30 South Pearl Street
Albany, New York 12207
Telephone: (518) 434-0600
Facsimile: (518) 434-0665
Email: lnikas@bsfllp.com

*Attorneys for Ann Freedman*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................ii-iv

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 4

I.      Plaintiffs Did No Diligence Before Purchasing the Work.................................... 4

II.     The Alleged Fraud at Knoedler Gallery Was Well Publicized More Than Two Years
        Before Plaintiffs Filed Their Complaint on November 27, 2013. ...................... 5

        A.      The May and July 2011 answers and crossclaims filed by the Dedalus
                Foundation in Killala Fine Art Ltd. v. Julian Weissman publicized the alleged
                fraud ................................................................................................ 5

        B.      Press coverage of Dedalus' answers and crossclaims in July and August 2011
                further publicized the alleged fraud ..................................................... 8

        C.      Plaintiffs filed their complaint on November 27, 2013. ......................... 9

ARGUMENT ....................................................................................................................... 9

I.      The Statute of Limitations Bars Plaintiffs' Fraud Claims Because They Were on
        Inquiry Notice of the Alleged Fraud More Than Two Years Before Filing Their
        Complaint............................................................................................................ 9

        A.      Plaintiffs were on inquiry notice in the summer of 2011, but waited until
                November 27, 2013, to file their complaint............................................ 9

        B.      Plaintiffs were on inquiry notice in June 2000, but waited until
                November 27, 2013, to file their complaint........................................... 12

II.     The Court Should Dismiss Plaintiffs' Fraud Claims Because They Fail to
        Adequately Plead Justifiable Reliance .............................................................. 13

III.    The Court Should Dismiss Plaintiffs' Fraudulent Concealment Claim for the
        Additional Reason That No Duty to Disclose Existed....................................... 20

CONCLUSION................................................................................................................... 21

<u>**TABLE OF AUTHORITIES**</u>

*Cases*                                                                                     *Page(s)*

*ACA Galleries Inc. v. Kinney,*
   552 F. App'x 24 (2d Cir. 2014)...................................................................... 14, 16

*ACA Galleries, Inc. v. Kinney,*
   928 F. Supp. 2d 699 (S.D.N.Y. 2013)....................................................... 14, 15, 19

*Aldrich v. Marsh & McLennan Cos., Inc.,*
   52 A.D.3d 435 (1st Dep't 2008)................................................................... 11

*Apthop Assocs., LLC v. 390 W. End Assocs., LLC,*
   No. 601721/08, 2009 WL 613606 (Sup. Ct. N.Y. Co. Mar. 6, 2009)...................... 20

*Arfa v. Zamir,*
   76 A.D.3d 56 (1st Dep't 2010), *aff'd,* 17 N.Y.3d 737 (2011)................................. 14

*Barbara v. MarineMax, Inc.,*
   No. 12-CV-0368, 2012 WL 6025604 (E.D.N.Y. Dec. 4, 2012) .......................... 9-10

*Barron Partners v. Lab123, Inc.,*
   593 F. Supp. 2d 667 (S.D.N.Y. 2009)......................................................... 20-21

*Bevelacqua v. Brooklyn Law Sch.,*
   No. 500175/2012, 2013 WL 1761504 (Sup. Ct. N.Y. Co. Apr. 22, 2013) .............. 14

*De Sole v. Knoedler Gallery, LLC,*
   974 F. Supp. 2d 274 (S.D.N.Y. 2013)............................................................ 2, 13

*Dopp v. Teachers Ins. & Annuity Ass'n of Amer.,*
   No. 91 Civ. 1494, 1993 WL 404076 (S.D.N.Y. Oct. 1, 1993)............................... 21

*Doukas v. Ballard,*
   No. 9267-11, 2013 WL 2129137 (Sup. Ct. Suffolk Co. May 1, 2013)..................... 11

*Foxley v. Sotheby's Inc.,*
   893 F. Supp. 1224 (S.D.N.Y. 1995)...............................................12-13, 16, 19, 20

*Gomez-Jiminez v. N.Y. Law Sch.,*
   943 N.Y.S.2d 834 (Sup. Ct. N.Y. Co. 2012), *aff'd,* 103 A.D.3d 13 (1st Dep't 2012),
   *leave denied,* 20 N.Y.3d 1093 (2013) ........................................................... 14

*Gutkin v. Siegal,*
   85 A.D.3d 687 (1st Dep't 2011)................................................................... 10

*Havell Capital Enhanced Mun. Income Fund, L.P. v. Citibank, N.A.,*
   84 A.D.3d 588 (1st Dep't 2011)................................................................... 20

*Hopkinson v. Estate of Siegal*,
    No. 10 Civ. 1743, 2011 WL 1458633 (S.D.N.Y. Apr. 11, 2011) ...................................... 10, 11

*HSH Nordbank AG v. UBS AG*,
    95 A.D.3d 185 (1st Dep't 2012)................................................................................ 13, 14, 19

*In re N.Y. TrapRock Corp.*,
    42 F.3d 747 (2d Cir. 1994).................................................................................................. 20

*In re Old Carco LLC*,
    509 F. App'x 77 (2d Cir. 2013)............................................................................................. 6

*In re Ultrafem Inc. Sec. Litig.*,
    91 F. Supp. 2d 678 (S.D.N.Y. 2000)................................................................................... 11

*In re Zyprexa Prods. Liab. Litig.*,
    549 F. Supp. 2d 496 (E.D.N.Y. 2008)................................................................................. 11

*McDonald v. McBain*,
    99 A.D.3d 436 (1st Dep't 2012)......................................................................................... 20

*Real Prop. Acquisitions Inc. v. Christie's Inc.*,
    No. 601943/04, 2005 N.Y. Misc. LEXIS 3285 (Sup. Ct. N.Y. Co. Mar. 29, 2005) ...............13

*Seung v. Fortune Cookie Projects*,
    No. 600537/09, 2010 WL 3310254 (Sup. Ct. N.Y. Co. Aug. 9, 2010)................................... 14

*Stuart Lipsky, P.C. v. Price*,
    215 A.D.2d 102 (1st Dep't 1995)........................................................................................ 20

*Tayebi v. KPMG LLP*,
    No. 105471/07, 2008 WL 518149 (Sup. Ct. N.Y. Co. Feb. 20, 2008)..................................... 11

*Terra Sec. ASA Konkursbo v. Citigroup, Inc.*,
    450 F. App'x 32 (2d Cir. 2011).......................................................................................... 13

*UST Private Equity Investors Fund, Inc. v. Salomon Smith Barney*,
    288 A.D.2d 87 (1st Dep't 2001)..................................................................................... 16, 19

*Valassis Commc'ns, Inc. v. Weimer*,
    304 A.D.2d 448 (1st Dep't 2003)........................................................................................ 20

*White v. H&R Block, Inc.*,
    No. 02 Civ. 8965, 2004 WL 1698628 (S.D.N.Y. July 28, 2004)................................... 8, 10, 11

***Other Authorities***

John R. Cahill, *"Keeping It Real": A Brief Primer on the Law of Art Authenticity*,
35 Colum J. L. & Arts 357 (2012) ..........................................................................................17

<u>**PRELIMINARY STATEMENT**</u>

In the mid-1990s, Glafira Rosales walked into Knoedler Gallery with a painting attributed to the abstract expressionist artist Mark Rothko.  She told Knoedler Gallery and its president, Ann Freedman, that the work was owned by the heir of an individual who purchased multiple works from leading artists of the 20th Century.  Freedman showed that Rothko, and each of the other works that Rosales brought to the gallery (the "Rosales Collection"), to the world's leading art scholars.  Those scholars gave Freedman every reason to believe the works were authentic.

In 2000, Silverman Gallery purchased from Knoedler Gallery a work of art attributed to Clyfford Still (the "Work") for Stephen Robert, a client of Feigen Gallery.  To complete the three-way transaction, Knoedler Gallery invoiced Silverman Gallery for $850,000; Silverman Gallery invoiced Feigen Gallery for $925,000; and Feigen Gallery invoiced Robert (the Work's ultimate purchaser) for $1,050,000 (plus $86,625 of sales tax).  Freedman told Silverman Gallery the story behind the Work (the same story that Rosales told to her), which it allegedly passed along the chain to Robert.  Plaintiffs purchased the Work without receiving a single document proving the accuracy of the story or consulting a single independent expert concerning the authenticity of the Work.

Eleven years passed.  And then an explosion of lawsuits and press uncovered Rosales' fraud.  On May 5 and July 22, 2011, the Dedalus Foundation filed pleadings in this Court, alleging an extensive fraud involving Knoedler Gallery, Freedman, Rosales, and Jose Bergantinos (all named as defendants in Plaintiffs' complaint here) that concerned the sale of forged abstract expressionist art, including works by Still.  The New York Post, the Art Market

Monitor, and The Observer published articles immediately thereafter detailing Dedalus'
allegations.

Now, over thirteen years after buying the Work and over two years since the world
learned of the fraud alleged in Plaintiffs' complaint, Plaintiffs filed this lawsuit.  The complaint
should be dismissed for the following reasons.

*First*, the statute of limitations for fraud is six years from the date of the alleged fraud or
two years from the date the fraud could have been reasonably discovered, whichever is later.
Plaintiffs filed their complaint on November 27, 2013, over thirteen years after the alleged fraud
and over two years from the time it should have been discovered in the summer of 2011.  The
lawsuit is therefore time-barred.

*Second*, Plaintiffs have failed to sufficiently plead justifiable reliance.  Although the
Court declined to determine on the pleadings whether the plaintiffs in *De Sole v. Knoedler
Gallery, LLC*, 974 F. Supp. 2d 274 (S.D.N.Y. 2013), were sophisticated, Plaintiffs (art galleries)
*admit* that they are sophisticated.  (Compl. ¶ 65.)

Despite their sophistication, Plaintiffs failed to make a single inquiry regarding the
Work's provenance before purchasing it.  Plaintiffs did not ask to speak with Knoedler Gallery's
staff about the Work's provenance or ask for historical documentation to support Knoedler
Gallery's representations of the Work's provenance.  In other words, Plaintiffs failed to conduct
*any* investigation of provenance before purchasing the Work.  And this is so even though
Plaintiffs allegedly would not have purchased the Work had they known the provenance was
undocumented.  (*Id.* ¶¶ 174, 181, 186, 191.)  Had Plaintiffs undertaken a basic investigation—for
example, had they simply asked for historical documents proving the Work's provenance—they
would have allegedly learned that the provenance was undocumented, and they would have

allegedly cancelled the transaction.  That alone is sufficient for dismissal, because if Plaintiffs did not buy the Work from Knoedler Gallery, then Robert would not have bought it from them, and Robert would have no damages.

Similarly, though Freedman allegedly told Plaintiffs "that experts in the artist Clyfford Still had examined the Work and vouched for its authenticity and importance in the artist's canon," Plaintiffs never even asked Freedman to identify who those experts were, much less attempt to speak to those experts, as Plaintiffs were obligated to do before buying the Work.  (*Id.* ¶ 173.  *See also id.* ¶ 51.)  Moreover, despite having the ability to bring the Work to an "expert conservator" prior to purchasing it, Plaintiffs never had the Work's authenticity or provenance investigated by a Still expert.  (*Id.* ¶ 54.)

According to Plaintiffs, their lack of diligence and blind reliance on Knoedler Gallery was reasonable because "numerous other sophisticated purchasers—including other art professionals, galleries, and museums—also relied on Knoedler's history and reputation in purchasing other works from the Rosales Collection based on these same misrepresentations." (*Id.* ¶ 65.)  But New York law says otherwise: Plaintiffs cannot establish justifiable reliance because they had the opportunity to conduct these inquiries before purchasing the Work, but failed to do so.

*Third*, in addition to the statute of limitations and justifiable reliance arguments above, Plaintiffs' fraudulent concealment claim fails because they and Freedman did not have a confidential or fiduciary relationship.  Instead, Knoedler Gallery's sale of the Work to Plaintiffs was an arms-length business transaction, nothing more.

The Court should dismiss Plaintiffs' claims against Freedman with prejudice.

## STATEMENT OF FACTS

### I.   PLAINTIFFS DID NO DILIGENCE BEFORE PURCHASING THE WORK.

Plaintiffs admit they are "sophisticated" purchasers.  (*Id.* ¶ 65.)[1]  And Robert is an experienced "collector" of high-end art.  (*Id.* ¶ 1.)

In spring 2000, Silverman Gallery received a promotion concerning the Work from Dorothy Goldeen Art Advisory.  (*Id.* ¶ 47.)  In June 2000, Silverman Gallery learned that a client of Feigen Gallery (Robert) was interested in acquiring a Still work.  (*Id.* ¶ 48.)  Silverman Gallery inquired of Dorothy Goldeen concerning the availability of the Work and was informed that Knoedler Gallery was offering it for sale.  (*Id.*)  Manny Silverman, president of Silverman Gallery, then contacted Freedman regarding the Work.  (*Id.* ¶ 50.)

According to Plaintiffs, when Silverman viewed the Work at Knoedler Gallery, Freedman "misrepresent[ed] that experts in the artist Clyfford Still had examined the Work and vouched for its authenticity and importance in the artist's canon."  (*Id.* ¶ 173.  *See also id.* ¶ 51.) "Freedman further represented to Silverman . . . that the anonymous seller of the Work was the son of a Swiss collector who had obtained the Work from Still directly[.]"  (*Id.* ¶ 51.) Freedman "did not mention that not one of the works in the Rosales Collection [including the Work] had a single sheet of paperwork to verify its provenance[.]"  (*Id.* ¶ 64(f).  *See also id.* ¶ 187(c).)  Silverman Gallery purportedly repeated Freedman's representations to Feigen Gallery, which, in turn, repeated them to Robert.  (*Id.* ¶ 53.)  Plaintiffs would not have purchased the Work had they known that experts had not authenticated it or that the Work's provenance had no documentary support.  (*Id.* ¶¶ 174, 181, 186, 191.)

---

[1] The allegations in the complaint are assumed to be true for purposes of this motion to dismiss.

Before buying the Work, Feigen Gallery submitted it to Alain Goldrach, Inc., "an expert conservator," to obtain a condition report.  (*Id.* ¶ 54.)  But Plaintiffs never submitted the Work to a Still expert to opine on its authenticity and provenance.  Moreover, Plaintiffs never even asked Freedman to identify the purported Still experts who examined the Work and did nothing to investigate the Work's provenance.  Rather, they blindly "rel[ied] upon Knoedler and Freedman's *unproven* tale about [the Work's] provenance and false representations about its authenticity."  (*Id.* ¶ 70 (emphasis added).)  Knoedler Gallery's "165-year old reputation" and letter of authenticity were all Plaintiffs needed to move forward.  (*Id.* ¶¶ 57, 176.)  According to Plaintiffs, their reliance was reasonable because "numerous other sophisticated purchasers— including other art professionals, galleries, and museums—also relied on Knoedler's history and reputation in purchasing other works from the Rosales Collection based on these same misrepresentations."  (*Id.* ¶ 65.)

On June 20, 2000, Knoedler Gallery sent an $850,000 invoice for the Work to Silverman Gallery.  (*Id.* ¶ 55.)  That same day, Silverman Gallery sent Feigen Gallery a $925,000 invoice for the Work.  (*Id.* ¶ 59.)  Feigen Gallery, in turn, provided Robert (the ultimate purchaser) an invoice for his purchase of the Work in the amount of $1,050,000 (plus $86,625 of sales tax).  (*Id.*)  The transaction was finalized on June 22, 2000.  (*Id.* ¶¶ 60, 61.)

## II. THE ALLEGED FRAUD AT KNOEDLER GALLERY WAS WELL PUBLICIZED MORE THAN TWO YEARS BEFORE PLAINTIFFS FILED THEIR COMPLAINT ON NOVEMBER 27, 2013.

### A. *The May and July 2011 answers and crossclaims filed by the Dedalus Foundation in* Killala Fine Art Ltd. v. Julian Weissman *publicized the alleged fraud.*

In 2007, Dedalus rendered an opinion that a Rosales work attributed to Motherwell was authentic, as a condition of Julian Weissman's sale of the work to Killala Fine Arts.  In 2009,

Dedalus retracted this opinion.  As a result, Killala filed a complaint in this Court on February 1, 2011, asserting claims against Weissman and Dedalus.[2]

On May 5, 2011, Dedalus filed an answer and crossclaims against Weissman.  *Killala Fine Art Ltd. v. Weissman*, No. 1:11-cv-00702-RJS, ECF No. 26 (Exh. 1).[3]  Dedalus' allegations connected Weissman to Knoedler Gallery, Freedman, Rosales, and Bergantinos (all named as defendants in Plaintiffs' complaint here): "At all times, Weissman did not disclose that he, and Ann Freedman, then President of Knoedler & Company, were obtaining paintings from a foreign born person named Glafira Rosales, with ties to the Dominican Republic and Spain, and that Glafira Rosales' husband or partner, Jose Carlos Begantinos Diaz had been accused publicly, as far back as 1999, of allegedly trafficking in forgeries[.]"  (Exh. 1, Answer ¶ 17.)

Dedalus alleged that seven works attributed to Motherwell (including four owned by Knoedler Gallery) "were highly suspect and anomalous."  *Id.* ¶ 29.  *See also id.* ¶ 29(k) ("At this point, all members of the Catalogue Raisonné committee . . . agree they are not by Motherwell[.]").

Dedalus also made clear that the collection of forgeries was not limited to Motherwell works—it included works by Still, Rothko, Pollock, de Kooning, Newman, and Kline.  For example, the pleadings alleged the following:

- "Freedman described this painting as coming from a special private Mexican collection containing Motherwells, and Freedman showed them three paintings purportedly by Jackson Pollock, Mark Rothko, and another well known artist, all of which Freedman also said came from the same secret collection none of which purportedly had been seen for nearly half a century."  *Id.* ¶ 29(c).

---

[2] The Court may take judicial notice of court filings.  *See, e.g.*, *In re Old Carco LLC*, 509 F. App'x 77, 79 (2d Cir. 2013) ("courts may take judicial notice of court filings to establish that certain matters have been publicly asserted") (citation omitted).

[3] "Exh." refers to the exhibits attached to the Declaration of Luke Nikas.

- "[Freedman] tells the Catalogue Raisonné Project that she has had paintings by Mark Rothko and Jackson Pollock from the same source[.]" *Id.* ¶ 29(i).

- "According to Freedman, paintings by other significant painters of Motherwell's era including Mark Rothko and Jackson Pollock, had derived from the same source[.]" Crossclaims ¶ 56.

- "Flam learned that the de Kooning Foundation had recently become aware of highly suspect works said to be by de Kooning which had passed through two galleries in New York City: Knoedler and the Weissman Gallery." *Id.* ¶ 68.

- "On February 20, 2008, a letter from Stephen Polcari (who also has been a paid consultant to Knoedler) is sent to Jack Flam by Knoedler.  Polcari discusses not only the Motherwells but also mentions works by Pollock, Still, Kline, Rothko and others as genuine works by those artists that come from the David Herbert collection.  On February 27, 2008, Jack Flam visits E.V. Thaw, co-author of the Pollock catalogue raisonné and asks him if it is true, as he understood Freedman to have said, that Thaw has seen the purported Pollock paintings from the David Herbert collections and thinks they are real.  Thaw tells Flam that he saw two of the supposed Pollocks, and that he told E.A. Carmean that they were not real Pollocks.  During the next few months, Flam speaks to experts on Barnett Newman, Willem de Kooning, and Jackson Pollock . . . . They all tell him that they suspect the paintings by those artists in the so-called David Herbert collection are fakes."  Answer ¶ 29(l).

- "On March 24, 2008, David Anfam—another paid consultant to Knoedler and who published both a purported Newman and a purported Rothko that came from the purported David Herbert collection, and who directed the Rothko catalogue raisonné—comes to Dedalus and discusses the David Herbert collection with Jack Flam and Katy Rogers.  Anfam believes the paintings to be real.  He observes that, given the nature of the collection, if one of the paintings is wrong they all are wrong." *Id.* ¶ 29(n).

- "On January 18, 2011, E.V. Thaw gives a videotaped affidavit stating that in his opinion the purported Pollocks from the David Herbert Collection are in his expert opinion fakes."  Answer ¶ 29(u).

Dedalus filed an answer and amended crossclaims with substantially similar allegations on July 22, 2011.  *Killala Fine Art Ltd. v. Weissman*, No. 1:11-cv-00702-RJS, ECF No. 33 (Exh. 2).

### B.   Press coverage of Dedalus' answers and crossclaims in July and August 2011 further publicized the alleged fraud.

On July 11, 2011, the New York Post published "'Ripoff' Artists Shock—Gallery 'Fakes' Suit" (Exh. 3) and "Manhattan Art Dealers Accused of Selling Forged Paintings" (Exh. 4).[4]  Those articles reported on Dedalus' counterclaims; implicated Knoedler Gallery, Freedman, Rosales, and Bergantinos in the alleged fraud; and confirmed that the alleged fraud was not limited to Motherwell works:

> Talk about a "rogues" gallery.  Two Manhattan art dealers—including the former longtime president of the prestigious Knoedler Gallery—have been accused of selling forged paintings, and concocting phony stories about their origins, by a group that authenticates the artwork of famed abstract expressionist Robert Motherwell.  Explosive court papers allege that Ann Freedman—who left Knoedler amid questions about the paintings' authenticity—and Julian Weissman, a former Knoedler salesman, claimed the works came from "secret" and "private" collections, with one supposedly owned by a Kuwaiti princess and another "acquired directly from Motherwell."  But the Dedalus Foundation, which was established by Motherwell before his death, says that the paintings all appear to be forgeries, with one board member calling them "laughable fakes."  It also says Freedman and Weissman may have sold phony paintings purportedly by other famous modern artists, including Willem de Kooning and Jackson Pollock.  The foundation charges that Freedman and Weissman got seven forged Motherwells from a Long Island woman, Glafira Rosales, whose "husband or partner," Jose Carlos Bergantinos Diaz, has "been accused publicly, as far back as 1999, of allegedly trafficking in forgeries."

The next day, the Art Market Monitor published a similar article, "Ex-Knoedler Employees Accused of Selling Fake Motherwells" (Exh. 5).  This article also reported that the alleged fraud extended beyond Motherwell works: "Anne [sic] Freedman and Julian Weissman both once worked at Knoedler and seem to have also used their contacts to sell forged works by Robert Motherwell and, possibly, Willem de Kooning and Jackson Pollock.  The forgeries came

---

[4] The Court may take judicial notice of articles in the press.  *See, e.g.*, *White v. H&R Block, Inc.*, No. 02 Civ. 8965 (MBM), 2004 WL 1698628, at *6 n.2 (S.D.N.Y. July 28, 2004) ("While the court cannot take judicial notice of these articles for the truth of the reports, the court can—and does—take judicial notice that the reports were made which is all that is necessary to trigger inquiry notice.") (citation omitted).

to light through a lawsuit involving Motherwell's Dedalus Foundation[.]"

News of the alleged scandal was even published internationally.  For example, on August 7, 2011, The Observer (UK) published an article titled "Forgery Row Exposes Murky Goings-on of Trade in Fine Art" (Exh. 6).  As with the other articles, this piece made clear that the alleged fraud was not confined to Motherwell works: "A bitter legal battle over an alleged trade in forged paintings has exposed the murkier side of the art world.  It is claimed in court papers that one of the world's leading art galleries, Knoedler of New York, has been involved in the sale of alleged forgeries of works by pre-eminent 20th century US artists, including Jackson Pollock, Richard Diebenkorn and Robert Motherwell."

### C.    Plaintiffs filed their complaint on November 27, 2013.

Notably, Plaintiffs admit that a *single article* published by The New York Times on December 2, 2011, reporting on an action filed by Pierre LaGrange against Knoedler and Freedman, was sufficient to put them on notice of the alleged fraud.  (Compl. ¶ 136.)  According to Plaintiffs, they did nothing before December 2, 2011, to investigate their claims.  (*Id.* ¶ 138.) Plaintiffs filed their complaint on November 27, 2013.

### ARGUMENT

## I.    THE STATUTE OF LIMITATIONS BARS PLAINTIFFS' FRAUD CLAIMS BECAUSE THEY WERE ON INQUIRY NOTICE OF THE ALLEGED FRAUD MORE THAN TWO YEARS BEFORE FILING THEIR COMPLAINT.

### A.    Plaintiffs were on inquiry notice in the summer of 2011, but waited until November 27, 2013, to file their complaint.

Plaintiffs' claims are untimely because they could have discovered the alleged fraud by exercising reasonable diligence more than two years before filing their complaint.

Fraud must be pled "with particularity," and all elements must be shown "by clear and convincing evidence."  *Barbara v. MarineMax, Inc.*, No. 12-CV-0368, 2012 WL 6025604, at

*19 (E.D.N.Y. Dec. 4, 2012) (quotations omitted).  "An action based upon fraud must be commenced within the greater of 6 years from the date the cause of action accrued or 2 years from the time plaintiff discovered or, with reasonable diligence, could have discovered the fraud."  *Gutkin v. Siegal*, 85 A.D.3d 687, 687 (1st Dep't 2011) (citing CPLR 213(8)).  "The test as to when fraud should with reasonable diligence have been discovered is an objective one.  Where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him."  *Id.* at 688 (text alteration and quotation omitted).  In other words, if plaintiff "makes no inquiry once the duty arises, knowledge will be imputed *as of the date the duty arose*."  *White*, 2004 WL 1698628, at *5 (emphasis added).  *See also Gutkin*, 85 A.D.3d at 688.

"A plaintiff need not be on notice of the entire fraud to trigger the duty of inquiry, she must simply possess sufficient operative facts which indicate that further inquiry should be pursued to determine whether she had been defrauded."  *Hopkinson v. Estate of Siegal*, No. 10 Civ. 1743(LBS), 2011 WL 1458633, at *5 (S.D.N.Y. Apr. 11, 2011) (text alterations and quotations omitted).  "In assessing whether 'storm warnings' were sufficient to put [plaintiff] on inquiry notice, courts examine any publicly available . . . information, including news articles or the filing of other lawsuits alleging fraud against the defendants."  *Id.* (quotation omitted).

Plaintiffs purchased the Work in 2000, over thirteen years before filing their complaint on November 27, 2013.  Plaintiffs must therefore show that they filed their fraud claim within two years of when they could have discovered with reasonable diligence sufficient facts to prompt further inquiry regarding the alleged fraud.  Because Plaintiffs did not conduct any investigation

into the alleged fraud before November 27, 2011, their fraud claim is time-barred if a duty of inquiry arose before that time. *White*, 2004 WL 1698628, at *5.  It did.

Dedalus' May 5 and July 11, 2011 answers and crossclaims, as well as related press coverage, implicated Knoedler Gallery, Freedman, Rosales, and Bergantinos in the alleged fraudulent sale of abstract expressionist works, including works by Still, and triggered Plaintiffs' duty to inquire. *See Aldrich v. Marsh & McLennan Cos., Inc.*, 52 A.D.3d 435, 436 (1st Dep't 2008) (plaintiffs "were on inquiry notice" where "extensive information," including "lawsuits commenced" by other parties, was "in the public domain") (citation omitted); *Doukas v. Ballard*, No. 9267-11, 2013 WL 2129137, at *3 (Sup. Ct. Suffolk Co. May 1, 2013) ("[A] . . . lawsuit was commenced, and newspaper articles about . . . the lawsuit were published . . . . Given that all of this information was in the public domain, the court finds that the plaintiffs were on inquiry notice of the alleged fraud[.]") (citations omitted); *Hopkinson*, 2011 WL 1458633, at *6 ("Lawsuits alleging similar fraud (even without assessment of their factual sufficiency) serve as a public event for the purpose of putting a plaintiff on inquiry notice.") (quotations omitted); *Tayebi v. KPMG LLP*, No. 105471/07, 2008 WL 518149, at *7 (Sup. Ct. N.Y. Co. Feb. 20, 2008) ("media coverage" and "similar lawsuits" "contributed to inquiry notice"); *In re Zyprexa Prods. Liab. Litig.*, 549 F. Supp. 2d 496, 534 (E.D.N.Y. 2008) ("Even a single news article can provide sufficiently strong omens to place a plaintiff on notice of the need for investigation.") (collecting cases); *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 692 (S.D.N.Y. 2000) ("Bloomberg News article placed plaintiffs on inquiry notice").

Notably, Plaintiffs *admit* that *a single article* published by The New York Times on December 2, 2011, was sufficient to put them on notice of the alleged fraud.  (Compl. ¶ 136.) That article, reporting on LaGrange's complaint, is legally indistinguishable from the press

11

reporting on Dedalus' claims in the summer of 2011.  In both situations, pleadings were filed in this Court alleging substantially the same fraud involving the same group of paintings, and they were first reported on by New York newspapers (where Feigen maintains its principal place of business and where Robert resides) that recounted substantially similar versions of the alleged fraud.  If anything, the New York Times article contained much *less* information about the alleged fraud than Dedalus' two pleadings and the articles that followed.

Plaintiffs had a duty to inquire into the alleged fraud at Knoedler Gallery before November 27, 2011.  Because they filed their complaint more than two years after that duty arose, the Court should dismiss their fraud claims as untimely.

### B.   Plaintiffs were on inquiry notice in June 2000, but waited until November 27, 2013, to file their complaint.

Plaintiffs were on inquiry notice of the alleged fraud and should have discovered all of the essential facts underlying their claims when they purchased the Work in June 2000.

The complaint establishes that Plaintiffs purchased the Work with full knowledge that (1) experts viewed the Work and opined on its authenticity; (2) Knoedler Gallery could not disclose the owner of the Work; and (3) Knoedler Gallery had not provided them with any documentation of the Work's provenance.  (*Id.* ¶¶ 51, 64(f), 173.)  Plaintiffs knew each of these facts, but never even asked Freedman to identify the experts who purportedly opined on the Work nor sought or obtained documentation underlying the Work's provenance.  Moreover, despite having the Work examined by a conservator before buying it, Plaintiffs never had a Still expert evaluate the Work's authenticity or provenance.

Because Plaintiffs were required to make such inquiries, and because they did not file their claims until *over thirteen years* after those inquiries would have uncovered the alleged facts underlying their fraud claims, those claims are time-barred.  *See, e.g.*, *Foxley v. Sotheby's Inc.*,

893 F. Supp. 1224, 1231-32 (S.D.N.Y. 1995) (dismissing fraud claim as untimely where purchaser of allegedly counterfeit painting made no independent inquiry as to painting's authenticity and waited seven years to bring suit).

## II.  THE COURT SHOULD DISMISS PLAINTIFFS' FRAUD CLAIMS BECAUSE THEY FAIL TO ADEQUATELY PLEAD JUSTIFIABLE RELIANCE.

In the Court's decision on the motions to dismiss, it concluded that Freedman's arguments regarding justifiable reliance were premature because it could not be determined on the pleadings whether plaintiffs were "sophisticated art collectors."  *De Sole*, 974 F. Supp. 2d at 313.  That is no barrier to granting this motion because Plaintiffs (art galleries) concede their sophistication.  (Compl. ¶ 65.)[5]  Thus, the only question the Court must answer is whether a sophisticated purchaser who does *nothing* before entering a major transaction has satisfied the reliance requirement.  If justifiable reliance has *any* meaning at all, the answer must be "no."

"It is well established that where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance."  *Terra Sec. ASA Konkursbo v. Citigroup, Inc.*, 450 F. App'x 32, 34 (2d Cir. 2011) (quotation and text alteration omitted).  "As a matter of law, a sophisticated plaintiff cannot establish that it entered

---

[5] Robert, an experienced "collector" (Compl. ¶ 1), is sophisticated as well.  *See, e.g.*, *Foxley*, 893 F. Supp. at 1229 (plaintiff, who lacked familiarity with the relevant art, was nonetheless "sophisticated" as a matter of law because he had experience purchasing art at auctions).  Further, there was nothing preventing Robert from employing an expert to investigate the Work prior to purchasing it, which mitigates any purported lack of sophistication.  *See, e.g.*, *HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185, 196 (1st Dep't 2012) ("if HSH believed that it lacked sufficient expertise to evaluate the NS4 transaction unassisted, it was free to retain qualified outside consultants"); *Real Prop. Acquisitions Inc. v. Christie's Inc.*, No. 601943/04, 2005 N.Y. Misc. LEXIS 3285, at *9-11 (Sup. Ct. N.Y. Co. Mar. 29, 2005) ("Ciccarello's attempt to evade the ramifications of his actions . . . by contending that he . . . was not a sophisticated purchaser . . . is both disingenuous and unavailing" because he could have "br[ought] an expert of his choosing to inspect the [work][.]").

into an arm's length transaction in justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that were available to it." *ACA Galleries, Inc. v. Kinney*, 928 F. Supp. 2d 699, 703 (S.D.N.Y. 2013), *aff'd*, 552 F. App'x 24 (2d Cir. 2014) (quotation omitted). "Even if some level of investigation is done, *a failure to investigate fully* can bar a finding of reasonable reliance." *Id.* at 704 (emphasis added).

New York courts routinely dismiss fraud claims where a sophisticated purchaser makes no effort (or an insufficient effort) to investigate alleged misrepresentations and omissions before consummating a transaction. *See, e.g.*, *Gomez-Jiminez v. N.Y. Law Sch.*, 943 N.Y.S.2d 834, 853 (Sup. Ct. N.Y. Co. 2012) (dismissing fraud claim because plaintiffs "cannot claim that it was reasonable to confine their research and reliance solely on what amount to just two sentences in NYLS's marketing materials"), *aff'd*, 103 A.D.3d 13 (1st Dep't 2012), *leave denied*, 20 N.Y.3d 1093 (2013); *HSH Nordbank AG*, 95 A.D.3d at 197 ("HSH's failure to undertake (either directly or through an advisor) an independent appraisal of the risks of the transaction necessarily leads to the conclusion that HSH was so lax in protecting itself that it cannot fairly ask for the law's protection.") (quotation and text alterations omitted); *Arfa v. Zamir*, 76 A.D.3d 56, 59 (1st Dep't 2010) (no justifiable reliance where plaintiffs did not "ma[k]e any use of the means available to them to ascertain the truth of the alleged misrepresentations at issue"), *aff'd*, 17 N.Y.3d 737 (2011); *Bevelacqua v. Brooklyn Law Sch.*, No. 500175/2012, 2013 WL 1761504, at *12 (Sup. Ct. N.Y. Co. Apr. 22, 2013) ("Reasonable reliance is a condition which cannot be met where a party has the means to discover the true nature of the transaction by the exercise of ordinary intelligence, and fails to make use of those means.") (text alterations and quotation omitted); *Seung v. Fortune Cookie Projects*, No. 600537/09, 2010 WL 3310254, at *5 (Sup. Ct. N.Y. Co. Aug. 9, 2010) ("Plaintiff conceded that she did not attempt to ascertain the painting's value until

14

after she agreed to its purchase. Plaintiff, therefore, did not show justifiable reliance on misrepresentations by Defendants[.]").

Because Plaintiffs are art galleries, the decision in *ACA Galleries* is directly on-point and dispositive. Defendant Kinney contacted ACA to advertise that he was selling a painting by Milton Avery. *ACA Galleries*, 928 F. Supp. 2d at 700. Kinney shipped the work to a warehouse in New York so that prospective buyers, including ACA, could view it. *Id.* ACA's President and COO, Bergen, inspected the work at the warehouse, deemed it authentic, and made the purchase. *Id.* After purchasing the work, ACA had it inspected by the Milton Avery Foundation, which determined that the work was inauthentic. *Id.* at 701. ACA sued Kinney for fraud. *Id.* at 700. Kinney moved for summary judgment, arguing that ACA could not demonstrate justifiable reliance. *Id.* at 702. The court agreed:

> ACA . . . had the opportunity to fully investigate the authenticity of the painting but failed to do so. . . . That ACA failed to avail itself of the opportunity to have the painting inspected by the Avery Foundation *or another expert prior to purchase*, and instead relied only on Bergen's inspection, was not reasonable. ACA is in the business of buying and selling art. Such a business must be cognizant of forgery of the works of well-known artists like Avery.

*Id.* at 703 (emphasis added). The court further ruled that, "[w]hen an art gallery has access to information regarding a painting's authenticity, but fails to pursue the information, it cannot reasonably rely on defendant's representations or omissions regarding the painting." *Id.* at 704. "The very fact that ACA felt the need to seek authentication by the Avery Foundation after the purchase indicates that it knew how to do so prior to the purchase. ACA's decision to wait is not protected under New York law." *Id.* The Second Circuit affirmed, holding that ACA could not obtain relief "because of its failure to investigate the authenticity of the painting at issue." *ACA Galleries*, 552 F. App'x at 25.

15

The decision in *Foxley* also requires dismissal.  Plaintiff Foxley alleged that Sotheby's told him in 1987 (when he purchased the work at issue) that a scholar named Breeskin had written a letter about the work.  *Foxley*, 893 F. Supp. at 1227.  Yet Foxley did not request the "Breeskin letter until 1993, when he learned for the first time that Breeskin's comments were predicated upon her review of a color transparency of the painting[.]"  *Id.* at 1228.  The fact that Breeskin based her assessment solely on a transparency, rather than the original, allegedly rendered it unreliable to Foxley and would have caused him not to buy the work.  *Id.*  The Court dismissed Foxley's fraud claim against Sotheby's because he could have requested the letter before purchasing the work, and "[t]he principle that access bars claims of justifiable reliance is well settled." *Id.* at 1229.  According to the court, "[a] reasonable response should have led [Foxley] either to obtain the letter . . . or to deduce that Sotheby's conduct was suspect and take appropriate action.  Therefore, the fact that Breeskin relied on a color transparency was readily available . . . and plaintiff did not reasonably rely on or ascertain the existence and content of the letter." *Id.* at 1229.

*UST Private Equity Investors Fund, Inc. v. Salomon Smith Barney*, 288 A.D.2d 87 (1st Dep't 2001), forecloses Plaintiffs' claims as well.  Plaintiffs purchased preferred stock in AbTox. *Id.* at 87.  After the deal closed, they learned that, contrary to prior misrepresentations, the FDA had not cleared AbTox's sole product for marketing.  *Id.* at 87-88.  Soon thereafter, the company filed for bankruptcy, and plaintiffs brought a fraud claim.  *Id.* at 88.  Plaintiffs alleged that the existence of the FDA deficiency letters had been concealed from them.  *Id.*  During due diligence, however, plaintiffs were presented with information that would have alerted them to the clearance issue, but they did not follow up by asking to review the company's files. *Id.*  "If plaintiffs had requested and carefully reviewed these documents during their due diligence, they

16

would have been apprised of the clearance issue before making their investment decision." *Id.*
"Accordingly, plaintiffs cannot claim to have justifiably relied on the statements regarding clearance[.]" *Id.* at 88-89.

Similarly, John Cahill (who represents other plaintiffs in actions against Knoedler Gallery and Freedman) has written that a reasonable art purchaser should thoroughly investigate a painting "to guard against purchasing [an] inauthentic work[]." John R. Cahill, *"Keeping It Real": A Brief Primer on the Law of Art Authenticity*, 35 Colum J. L. & Arts 357, 359 (2012). According to Cahill's article, purchasers such as Plaintiffs should be "engaging in the 'serious' investigations that ought to be undertaken before entering into what are, after all, major financial transactions." *Id.* at 365.  As the chart below demonstrates, however, Plaintiffs took *only one* of the actions that Cahill recommends.

| ACTIONS TO TAKE "BEFORE ACQUIRING AN ARTWORK THAT HAS MATERIAL VALUE"<br><br>35 Colum. J. L. & Arts 357, 367 | PLAINTIFFS' ACTIONS BEFORE BUYING THE WORK |
|---|---|
| "Diligently research provenance, using a professional researcher if necessary." | None. |
| "Carefully examine original documentation when possible." | None. |
| "Verify provenance when possible; do not assume that an invoice is complete or correct." | None. |
| "Consult an up-to-date catalogue raisonné if available." | None. |
| "Confirm acceptance by authenticating committee or foundation if applicable." | None. |
| "Identify and consult scholars, connoisseurs, dealers and other experts to the extent possible . . . ." | None. |
| "Consult a conservator or other qualified professional and obtain a careful analysis of the condition of the artwork." | Feigen Gallery submitted the Work to a conservator. (Compl. ¶ 54.) |
| "Consider consulting a forensic or other scientific expert to test the artwork for anachronistic or incongruent materials." | None. |

| | |
|---|---|
| "Get detailed representations and warranties in a signed writing, including . . . representation[s:] . . . about the provenance of the work and that all documents and information has been provided"; "that there are no known claims or information tending to cast doubt on authenticity"; and "[d]etails about the materials used in creating the artwork." | None. |
| "Get a signed writing from a reliable party that includes the right to[] '[c]ancel and rescind the sale during a specific time period if the artwork is found to be inauthentic by specified criteria (*e.g.*, by forensic testing, etc.).'" | None. |

Plaintiffs allege that Freedman failed to disclose that there was no documentation supporting the Work's provenance. (Compl. ¶¶ 64(f), 187(c).) Plaintiffs also allege that Freedman misrepresented that, "experts in the artist Clyfford Still had examined the Work and vouched for its authenticity and importance in the artist's canon." (*Id.* ¶¶ 51, 173.) Plaintiffs would not have purchased the Work had they known either of these critical facts. (*Id.* ¶¶ 174, 181, 186, 191.)

But Plaintiffs did nothing to investigate these alleged misrepresentations and omissions before buying the Work. Plaintiffs did not (1) ask to speak with Knoedler Gallery's staff about the Work's provenance or (2) ask for historical documentation to support Knoedler Gallery's representations of the Work's provenance. For example, had they simply asked to see documentation, Plaintiffs would have quickly uncovered that there is not "a single sheet of paperwork to verify [the Work's] provenance[.]" (*Id.* ¶ 64(f). *See also id.* ¶ 187(c).) Despite having ample opportunity, however, Plaintiffs did not ask for historical documentation. Similarly, Plaintiffs could have easily asked Freedman to identify the experts who purportedly opined on the Work and contacted them, but chose not to.

Plaintiffs were no less capable of asking Knoedler Gallery for documentation of the Work's provenance and to identify the purported experts who opined on the Work than plaintiffs in *UST* were of asking to investigate documents concerning FDA clearance issues or Foxley was

18

of asking Sotheby's for the Breeskin letter.  But they failed to do so and, like plaintiffs in *UST* and Foxley, have therefore failed to show that their reliance was justifiable.  *See UST Private Equity Investors Fund*, 288 A.D.2d at 88 (no justifiable reliance where plaintiffs failed to "request[] and carefully review[]" documents); *Foxley*, 893 F. Supp. at 1229 ("access bars claims of justifiable reliance") (quotation omitted).  *Accord ACA Galleries*, 928 F. Supp. 2d at 703.[6]

Moreover, the fact that Plaintiffs brought the Work to Alain Goldrach, "an expert conservator," to obtain a condition report before buying it, shows that they knew how to consult an outside expert regarding the Work.  (*Id.* ¶ 54.)  *See, e.g.*, *ACA Galleries*, 928 F. Supp. 2d at 704 ("The very fact that ACA felt the need to seek authentication by the Avery Foundation after the purchase indicates that it knew how to do so prior to the purchase.").  They could have just as easily sought out a Still expert to opine on the Work's authenticity and provenance.  They did not.  Because of that, Plaintiffs cannot establish justifiable reliance as a matter of law.  *See, e.g.*, *id.* at 704 ("When an art gallery has access to information regarding a painting's authenticity, but fails to pursue the information, it cannot reasonably rely on defendant's representations or omissions regarding the painting.").

Far from "fail[ing] to investigate fully," *id.* at 704, Plaintiffs did no investigation at all.  Because Plaintiffs could have uncovered by exercising minimal diligence the allegedly misrepresented and omitted information before purchasing the Work, they cannot establish justifiable reliance as a matter of law.  *See HSH Nordbank AG*, 95 A.D.3d at 197 ("[N]owhere does the amended complaint allege that HSH . . . ever asked UBS—which, after all, was acting

---

[6] Plaintiffs allege that their case is different.  According to Plaintiffs, it was reasonable for them to do absolutely nothing before buying the Work because of Knoedler's "165-year old reputation." (Compl. ¶ 176.)  If Plaintiffs' assertion were the law, however, it would eviscerate the doctrine of justifiable reliance in virtually every case involving a reputable defendant—including nearly all of the cases cited in this brief.

as a *salesman*, not as HSH's advisor—to produce any alternative analysis of the transaction in its possession . . . . UBS had no obligation to disclose internal analyses for which HSH made no request.") (citation omitted) (emphasis in original); *McDonald v. McBain*, 99 A.D.3d 436, 437 (1st Dep't 2012) (affirming dismissal of fraud claim because plaintiff is "obligated to conduct his own independent verification of defendant's alleged statements" and "the complaint is devoid of an indication that he made any 'reasonable investigation' whatsoever") (quotation and citation omitted); *Valassis Commc'ns, Inc. v. Weimer*, 304 A.D.2d 448, 448-49 (1st Dep't 2003) (affirming dismissal of fraud claim where plaintiff "failed to verify the accuracy" of information given to it); *Stuart Lipsky, P.C. v. Price*, 215 A.D.2d 102, 103 (1st Dep't 1995) (no justifiable reliance where plaintiffs did not seek to verify oral representations by asking for documentation); *Apthop Assocs., LLC v. 390 W. End Assocs., LLC*, No. 601721/08, 2009 WL 613606, at *3 (Sup. Ct. N.Y. Co. Mar. 6, 2009) (no justifiable reliance where "there is no assertion on the part of plaintiff that it attempted to search West End's records").

### III.   THE COURT SHOULD DISMISS PLAINTIFFS' FRAUDULENT CONCEALMENT CLAIM FOR THE ADDITIONAL REASON THAT NO DUTY TO DISCLOSE EXISTED.

In addition to the reasons stated above, *see, e.g.*, *Foxley*, 893 F. Supp. at 1231 n.5 ("Any claim for fraudulent concealment must also fail since all the elements of fraud are incorporated into fraudulent concealment."), the Court should dismiss Plaintiffs' fraudulent concealment claim because they and Freedman did not have a confidential or fiduciary relationship.

"A claim for fraudulent concealment must allege . . . a duty to disclose." *In re N.Y. TrapRock Corp.*, 42 F.3d 747, 754 (2d Cir. 1994). An arm's-length business relationship does not create a duty to disclose. *See Havell Capital Enhanced Mun. Income Fund, L.P. v. Citibank, N.A.*, 84 A.D.3d 588, 589 (1st Dep't 2011) (affirming dismissal because "[a]bsent a confidential or fiduciary relationship, defendant was not under a duty to disclose"); *Barron Partners v.*

*Lab123, Inc.*, 593 F. Supp. 2d 667, 672 (S.D.N.Y. 2009) (dismissing fraud claim premised on nondisclosure "because defendants have failed to allege any facts sufficient to demonstrate that the relationship between the parties was anything other than arm's-length"); *Dopp v. Teachers Ins. & Annuity Ass'n of Amer.*, No. 91 Civ. 1494, 1993 WL 404076, at *5 (S.D.N.Y. Oct. 1, 1993) ("The arm's-length relationship of parties in a business transaction is, if anything, antithetical to the notion that either would owe a fiduciary relationship to the other.").

The complaint fails to allege any facts to support a conclusion that Freedman had a duty to disclose.  Instead, it shows only an arm's length business transaction between Plaintiffs and Knoedler Gallery.  Plaintiffs' fraudulent concealment claim therefore fails as a matter of law.

## CONCLUSION

For the above reasons, the Court should dismiss Plaintiffs' claims against Freedman with prejudice.

Dated: August 15, 2014

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

By:    */s/ Luke Nikas* _____

Luke Nikas
30 South Pearl Street
Albany, New York 12207
Telephone: (518) 434-0600
Facsimile: (518) 434-0665
Email: lnikas@bsfllp.com

*Attorneys for Ann Freedman*

21